# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

JEFFREY G.,

                               Plaintiff,

        v.                                 5:20-CV-1016
                                                (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                               Defendant.

KENNETH R. HILLER, ESQ., for Plaintiff
MOLLY CARTER, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM-DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1, and the consent of the parties. (Dkt. Nos. 4, 7).

## I.   PROCEDURAL HISTORY

On June 1, 2017, plaintiff protectively filed an application for Supplemental Security Income ("SSI"), alleging disability beginning February 18, 2015. (Administrative Transcript ("T") 70, 72). Plaintiff's application was denied initially on August 17, 2017. (T. 84-87). Plaintiff requested a hearing, which was held before Administrative Law Judge ("ALJ") Elizabeth W. Koennecke on February 12, 2019. (T. 40-57). Plaintiff testified at the initial hearing, after which ALJ Koennecke determined that the opinion of a vocational expert ("VE") was necessary. (*Id.*). On June 19, 2019,

a second hearing was held at which ALJ Koennecke took testimony from VE Erbacher. (T. 59-69). On March 11, 2019, the ALJ issued a decision denying plaintiff's claim. (T. 11-22). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on July 8, 2020. (T. 1-4).

## II.    GENERALLY APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment

which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.  The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step.  *Id.*

### B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision.  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).  It must be "more than a scintilla" of evidence scattered throughout the administrative record.  *Id.*  However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'"  *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include

that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision.  *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record.  *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony).  However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.  **FACTS**

Plaintiff was born on August 6, 1965, making him 53 years old on the date of the administrative hearing.  (T. 45).  He had a driver's license and could operate a vehicle on his own, although he did not drive often.  (T. 54).  Plaintiff lived in an "upstairs" apartment requiring the use of stairs.  (T. 53).  After graduating high school, plaintiff pursued a vocational study in welding.  (*Id.*).  He also became certified in splicing fiber optics.  (*Id.*).  Plaintiff was most recently employed repairing boats, a position he described as "fairly physical."  (T. 46-47).

Plaintiff testified that he had spinal stenosis and several herniated discs in his neck.  (T. 49).  Although he had already undergone a "triple spinal fusion," his surgeon was recommending another surgery.  (*Id.*).  Plaintiff continued to suffer from pain

4

above and below the site of his fusion, and testified that the surgery "didn't take correctly." (T. 50). At the time of the hearing plaintiff was treated for his cervical pain with injections. (T. 50). Plaintiff's neck pain was exacerbated by a previously suffered broken collarbone. (T. 50-51). Plaintiff experienced neck pain every day. (T. 51).

In addition, plaintiff injured his ankle in 1997 at work and still experienced "serious" problems, including bone spurs. (T. 49). Plaintiff testified to having approximately seven surgeries on his ankle, none of which were successful. (T. 49). His doctor recommended a total ankle replacement. (T. 49-50). Plaintiff testified that he had to be "really careful . . . how [he walked] with the ankle," because sliding or rotating it caused him pain. (T. 51). He used supportive shoes, arch supports, braces and ice to alleviate his ankle pain. (*Id.*). He also took pain medication for his neck, back and ankle pain. (T. 51-52).

With respect to plaintiff's other medical issues, he had "cancer blood screenings" every six months due to a past diagnosis of prostate cancer. (T. 54). Plaintiff suffered from incontinence as a result of a related surgery. (T. 54-55). He also testified that he was legally blind in his right eye, and suffered from tinnitus. (T. 55-56).

Plaintiff testified that he had "a lot of problems looking down." (T. 52). He was limited in his ability to do housework and sit at a desk to write. (T. 52, 55-56). He estimated that he could walk approximately 50 feet before "really" starting to aggravate his pain. (T. 52-53). He sometimes used a motorized cart while grocery shopping. (T. 54).

5

## IV.   **THE ALJ'S DECISION**

After reviewing the procedural history of the plaintiff's application and stating the applicable law, the ALJ found that plaintiff had not engaged in substantial gainful activity ("SGA") since June 1, 2017, his application date.  (T. 13).  At step two of the sequential evaluation, the ALJ found that plaintiff's degenerative disc disease of the cervical and thoracic spine constituted severe impairments.  (*Id.*).  The ALJ explained that plaintiff's "residuals of his prostate cancer, residuals of his right ankle fracture, and visual impairments" were "non-severe," because plaintiff did not demonstrate that they caused significant functional limitations.  (T. 14).  The ALJ also found that plaintiff had not demonstrated that his "arthritis in his right shoulder, status post collarbone and right rib fracture, tinnitus, headaches, and carpal tunnel syndrome" were medically determinable impairments.  (*Id.*).  In doing so, the ALJ recognized the reference to an electromyography/nerve conduction study positive for carpal tunnel syndrome in the record.  (*Id.*).  However, in addition to noting that the study itself was not included in the record, the ALJ stated that there were no other objective signs that the claimant's carpal tunnel syndrome was a medically determinable impairment.  (*Id.*).

At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a Listed Impairment.  (T. 15).

At step four, the ALJ found that plaintiff had the RFC to perform a modified range of light work.  (T. 15, 21).  Plaintiff could lift, carry, push and/or pull 20 pounds occasionally and 10 pounds frequently.  (T. 15).  The ALJ further concluded that plaintiff could perform no overhead work, but could perform reaching in all other

directions on a frequent basis. (*Id.*). In addition, she found that plaintiff had no limitations in regard to sitting, standing and walking; could perform all postural tasks on at least an occasional basis; and was capable of turning his head from side-to-side and looking up and down. (*Id.*).

Next, the ALJ found that plaintiff was unable to perform any past relevant work. (T. 20). However, at step five, using the Medical Vocational Guidelines as a "framework," and the VE's testimony, the ALJ found that plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (T. 21). Thus, the ALJ found that plaintiff was not disabled. (T. 22).

## V.    ISSUES IN CONTENTION

Plaintiff's arguments contesting the ALJ's decision may be summarized as follows:

1.    The ALJ erred at step two in concluding that plaintiff's carpal tunnel syndrome was not a medically determinable impairment. (Plaintiff's Brief ("Pl.'s Br.") at 16-20) (Dkt. No. 14-1).

2.    The ALJ failed to support the RFC determination with substantial evidence and improperly relied on her own lay judgment with respect to her evaluation of Dr. Lorensen's opinion. (Pl.'s Br. at 23-27).

3.    The ALJ failed to develop the record before rejecting the opinion of PA Bossi. (Pl.'s Br. at 27-28).

The Commissioner contends that the ALJ sufficiently evaluated the evidence of record, and that her decision was supported by substantial evidence. (Defendant's Brief ("Def.'s Br.") at 3-23) (Dkt. No. 15). For the following reasons, this court agrees with

the defendant and will affirm the Commissioner's final decision.

## DISCUSSION

## VI. MEDICALLY DETERMINABLE IMPAIRMENT

### A.    Legal Standards

In order to be found disabled, a claimant must show that he is unable to perform any substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 20 C.F.R. §§ 404.1505(a), 416.905(a). "Consequently, only impairments that are 'medically determinable impairments' can be considered in the disability analysis." *Flower v. Comm'r of Soc. Sec.*, No. 6:16-CV-1084 (GTS), 2018 WL 895579, at *5 (N.D.N.Y. Feb. 13, 2018).

In order to qualify as a medically determinable impairment, an impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical or laboratory diagnostic techniques[1]" from an acceptable medical source. 20 C.F.R. §§ 404.1521, 416.921; §§ 404.1529, 416.929; *Woodard v. Berryhill*, No. 3:17-CV-1124, 2018 WL 3536084, at *4 (D. Conn. July 23, 2018) (internal quotation marks, citations and brackets omitted).  Furthermore, the evidence must "show the existence of a medical impairment(s) . . . which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§

---

[1]"Diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests." 20 C.F.R. §§ 404.1502(g), 416.902(g).

404.1529(b), 416.929(b).  A claimant bears the burden of establishing that he or she has a medically determinable impairment.  *Woodard v. Berryhill,* 2018 WL 3536084, at *4. The existence of a medically determinable impairment is not established by a claimant's "statement of symptoms, a diagnosis, or a medical opinion[.]" 20 C.F.R. §§ 404.1529(b), 416.929(b).

### B.    Analysis

Plaintiff argues that the ALJ erred at step two when she "improperly relied on an obvious gap in the record to find that plaintiff's carpal tunnel syndrome was not a medically determinable impairment."  (Pl.'s Br. at 16).  Plaintiff also argues that the ALJ erred by failing to "develop the record or consider any functional limitations caused by plaintiff's carpal tunnel syndrome throughout the balance of her analysis." (*Id*).

Plaintiff points to the following medical evidence in support of his position that he had carpal tunnel syndrome that qualified as a medically determinable impairment. On January 12, 2016, neurosurgeon Dr. Galgano evaluated plaintiff in conjunction with complaints of chronic neck pain.  (T. 341).  Plaintiff also reported "occasional numbness of his first three fingers" in both arms.  (*Id.*).  In the medical record reflecting this visit, Dr. Galgano references an electromyogram and nerve conduction study ("EMG/NCS") revealing ". . . mild to moderate [right] carpal tunnel, and mild [left] carpal tunnel."  (*Id.*).  Upon neurological examination that day, Dr. Galgano found that plaintiff displayed full strength in both upper extremities, and exhibited a positive

"Hoffman's sign"[2] in the left hand.  (T. 342).  Dr. Galgano did not specifically include

"carpal tunnel syndrome" under the list of plaintiff's diagnoses or in his past medical

history (T. 341-42), nor did he discuss treatment for a diagnosis of carpal tunnel

syndrome in his assessment and plan (T. 342-43).  The EMG/NCS itself is not

contained in the record before this court.  It is also not cited by any other provider.

Plaintiff further claims to have reported "carpal tunnel symptoms" to multiple

providers during the "relevant period" of alleged disability.  (Pl.'s Br. at 17-18).  On

April 16, 2015, plaintiff complained of chronic neck pain along with "decreased"

numbness and tingling in both arms to physician's assistant ("PA") Gabrielle Canal of

Neurosurgical Associates of Northern NY.  (T. 357, 362).  At an August 27, 2015 visit

to the same practice, plaintiff complained of back pain with numbness and tingling in

both arms, but denied shooting pain.  (T. 351, 355-56).

Plaintiff returned for follow-up treatment on September 10, 2015, with

complaints of pain and numbness in his fingertips.  (T. 345).  Upon neurological

examination, Dr. Montgomery found that plaintiff exhibited 4-5/5 strength in his upper

extremities, with some diminished sensation to light touch.  (T. 349).  Dr. Montgomery

addressed plaintiff's complaints, noting his concern that "some of [plaintiff's]

discomfort is coming from continued problems with the potential for pseudoarthrosis

and a lack of complete union.  We are going to send him for EEG nerve conduction

---

[2]"'Hoffman's sign is present if tapping the nail on the third or fourth finger elicits involuntary flexion of the distal phalanx of the thumb and index finger,' which indicates spinal cord compression." *Dale v. Astrue*, No. 4:10-CV-632, 2011 WL 2621539, *3 n. 3 (E.D. Mo. July 5, 2011) (*citing* The Merck Manual of Diagnosis and Therapy 325 (18th ed. 2006)).

study just to rule out any problems of peripheral neuropathy."[3]  (T. 349).

The next medical record cited by plaintiff is a neurosurgical follow-up dated April 28, 2017.  (T. 332).  At that time, carpal tunnel syndrome was still not listed in plaintiff's medical history, nor did PA Smith assess it as a current condition.  Plaintiff did complain to PA Smith of neck and arm pain, with "only occasional[ ]. . . numbness in hands."  (T. 335).  Neurological examination revealed full upper extremity motor strength and upper extremity sensation to light touch within normal limits.  (T. 336-337).  PA Smith assessed plaintiff with, among other things, "cervical spondylosis with radiculopathy" and "pseudoarthrosis of the cervical spine."  (T. 334-335).  He referred plaintiff for cervical injections and physical therapy.  (T. 335).

Last, plaintiff cites to a July 12, 2018 neurosurgical follow-up with PA Irvin.  (T. 657).  At this visit, plaintiff complained of neck pain radiating into his shoulder blades, along with numbness and tingling in his fingers, weakness in his upper extremities, and clumsiness of grip.  (T. 660).  Based on plaintiff's complaints and the results of his examination, PA Irvin ordered an EMG and nerve conduction study of plaintiff's upper extremities, "to assess for acute vs. chronic nerve irritation."  (*Id.*).

As previously discussed, the ALJ explicitly considered whether carpal tunnel syndrome was a medically determinable impairment for purposes of plaintiff's disability analysis.  (T. 14).  After careful consideration of the parties' arguments and the evidence of record, this court finds that the ALJ's decision to omit carpal tunnel

---

[3]It is certainly possible that the tests ordered by Dr. Montgomery on September 10, 2015 are the same as those referred to by Dr. Galgano on January 12, 2016.

syndrome as a medically determinable impairment is supported by substantial evidence. At the outset, the majority of evidence cited by plaintiff significantly precedes the relevant disability period.  Plaintiff applied for SSI benefits on June 1, 2017.  His claim for benefits was not retroactive to the date his application was filed, thus the ALJ was under no obligation to consider plaintiff's alleged disabilities existing outside of the period under consideration.  *See* SSR 18-1p; *Baladi v. Barnhart*, 33 F. App'x 562, 564 (2d Cir. 2002) ("Because SSI benefits . . . can only be granted prospectively, the only issue to be determined . . . was whether plaintiff was disabled as of the date of his application . . . .").  Otherwise put, evidence of plaintiff's condition prior to his June 1, 2017 application date was not relevant to the ALJ's inquiry at step two, to the extent it did not indicate an ongoing impairment.

The ALJ based her decision to omit carpal tunnel syndrome as a medically determinable impairment, in part, on the absence of the EMG/NCS from the record.  (T. 14).  If the EMG/NCS had been performed during the relevant period of disability, perhaps the plaintiff would be in a stronger position to argue that the ALJ's failure to follow-up and obtain this evidence constituted error warranting remand.  However, it is clear that the test preceded the disability period in question by over a year.  Thus, even if the EMG/NCS results referenced by Dr. Galgano were in the record, and showed that plaintiff suffered from "mild to moderate" carpal tunnel syndrome in early 2016, it would not have compelled an alternative finding by the ALJ.

A comprehensive review of the record demonstrates that the ALJ's decision at step two is supported by substantial evidence from the relevant period of alleged

disability, and need not be disturbed.  Notably, the record does not contain any "medically acceptable clinical or laboratory diagnostic techniques from an acceptable medical source" showing that plaintiff had carpal tunnel syndrome between June 1, 2017 and the date of the ALJ's decision.  This is consistent with plaintiff's longitudinal medical records immediately preceding, as well as during, the period at issue, which do not identify carpal tunnel syndrome in plaintiff's medical history, nor assess the condition as a current diagnosis or ongoing problem.  Moreover, the medical evidence indicates that plaintiff generally displayed full strength and range of motion in both upper extremities, with his sensation to light touch measured within normal limits.  (T. 336-37, 599-600, 656, 659).

It also bears noting that plaintiff did not list carpal tunnel syndrome as a physical condition that limited his ability to work in his initial application (T. 208), nor is it identified in the list of medically determinable impairments contained in his attorney's January 10, 2018 pre-hearing brief (T. 251-52).  *See Piatt v. Colvin*, No. 13-CV-6436, 2015 WL 274180, *9-10 (W.D.N.Y. 2015) (ALJ did not err by failing to consider plaintiff's carpal tunnel syndrome or restless leg syndrome at step two where those impairments were not listed in the application for benefits and where there was no evidence that plaintiff received treatment for those impairments); *Vega v. Astrue*, No. 08-CV-01525, 2009 WL 961930, at *5 (S.D.N.Y. Apr. 6, 2009) ("[T]he Court cannot fault the ALJ for failing to address physical impairments that [plaintiff] never indicated [he] had[.]"), *report and recommendation adopted in part*, 2010 WL 2365851 (June 10, 2010).

To plaintiff's point, there is some evidence in the record suggesting symptoms consistent with a diagnosis of carpal tunnel syndrome, including plaintiff's complaints of numbness and tingling in his fingers and decreased grip strength.  Nevertheless, plaintiff's subjective complaints alone are insufficient to satisfy his burden of proving a medically determinable impairment, and the record is devoid of any diagnostic test results during the period in question indicating the presence of carpal tunnel syndrome. See *Gaugette v. Colvin*, No. 14-CV-70, 2015 WL 6000258, at *6 (D. Vt. Oct. 14, 2015) (finding the absence of a proper diagnosis for carpal tunnel syndrome to be substantial evidence supporting a finding that there was no medically determinable impairment).

Furthermore, the ALJ's step two decision did not result in the ALJ's failure to consider those functional limitations plaintiff presently associates with carpal tunnel syndrome.  On the contrary, the ALJ explicitly considered plaintiff's historical complaints of numbness and tingling in his upper extremities.  The ALJ discussed these symptoms in conjunction with plaintiff's cervical spine condition at subsequent steps of the disability analysis, in light of her finding that plaintiff's degenerative disc disease was severe.  This is consistent with the opinion of plaintiff's own treating providers, who often associated his upper extremity complaints with his cervical condition and surgery.  (T. 334-35, 349, 660).  Since the ALJ's decision regarding the medical determinabililty of plaintiff's carpal tunnel syndrome is supported by substantial evidence, remand is not required on this basis.

## VII.   RFC/EVALUATING MEDICAL EVIDENCE

### A.   Legal Standards

#### 1.   RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule.  *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill,* No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R. §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v. Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019); *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010)  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities.  *Roat v. Barnhart*, 717 F. Supp. 2d 241, 267

(N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v. Colvin,* 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004).  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence.  *Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing SSR 96-8p, 1996 WL 374184, at *7).

## 2.    Evaluating Medical Evidence

The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded.  According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion."  *Revisions to Rules Regarding the Evaluation of Medical Evidence* ("*Revisions to Rules*"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), *see* 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors."  20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical

opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." *Id.* at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. *Revisions to Rules*, 82 Fed. Reg. 5844-01 at 5853. An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. *Id.* at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered

those factors contained in paragraphs (c)(3) through (c)(5).  *Id.* at §§ 404.1520c(b)(3), 416.920c(b)(3).

### B.     Analysis

Plaintiff challenges the ALJ's evaluation of certain medical evidence of record, claiming that it resulted in an unsupported RFC for modified light work.  Specifically, plaintiff challenges the ALJ's evaluation of the opinions rendered by consultative examiner Dr. Lorensen (Pl.'s Br. 20-24) and PA Bossi (Pl.'s Br. 24-25).  For the following reasons, this court finds that the ALJ's evaluation of the medical evidence and ultimate RFC determination was supported by substantial evidence, and remand is not warranted on these bases.

### 1.     Dr. Lorensen

Dr. Elke Lorensen performed a consultative physical examination of plaintiff on July 20, 2017.  (T. 597-600).  Prior to the examination, plaintiff complained of neck pain, back pain, prostate cancer, blindness in his right eye, and ankle pain.  (T. 597). Plaintiff reported that he cooked five times a week and cleaned once a week, but did not do his own laundry.  (T. 598).  He also reported shopping twice a week, showering three times a week, and dressing himself daily.  (*Id.*).

Upon examination, Dr. Lorensen observed plaintiff to be in no acute distress.  (T. 598).  Plaintiff walked with a normal gait, however declined to squat or walk on his heels and toes.  (*Id.*).  Plaintiff did not require help changing for the exam or getting on and off the examination table.  (*Id.*).  He was able to rise from the chair without difficulty.  (*Id.*).  Plaintiff exhibited some decreased range of motion in his cervical and

lumbar spine, and full range of motion in his elbows, forearms, and wrists. (T. 599).

Plaintiff exhibited forward elevation and abduction of the shoulders "100 degrees

bilaterally." (*Id.*). His right ankle exhibited some decreased range of motion, while his

left ankle exhibited full range of motion. (*Id.*). Plaintiff's neurological examination

was unremarkable, indicating deep tendon reflexes physiologic and equal in upper and

lower extremities, no sensory deficits, and full strength in the upper and lower

extremities. (*Id.*). Plaintiff displayed intact hand and finger dexterity, with full grip

strength. (T. 600).

At the conclusion of her examination, Dr. Lorensen opined that plaintiff had "no

gross limitation" for sitting, standing, walking or handling small objects. (*Id.*). She

further opined that plaintiff had "moderate limitations" for bending, lifting, reaching,

and turning his head. (*Id.*).

Plaintiff contends that the ALJ's RFC for modified light work is incongruous

with Dr. Lorensen's medical opinion. Plaintiff claims that despite Dr. Lorensen's

opined moderate limitations for bending and reaching, the ALJ's RFC did not include

any specific limitation for bending and only limited plaintiff to frequent reaching and

no overhead work. Plaintiff also points out that the RFC does not include any

limitation for head turning, despite Dr. Lorensen's opinion for moderate limitations as

to this function. Because the ALJ found Dr. Lorensen's opinion to be "persuasive,"

plaintiff essentially argues that the ALJ's failure to adopt all of Dr. Lorensen's findings

was error warranting remand.

For the following reasons, the ALJ's analysis of Dr. Lorensen's opinion and

resulting RFC did not constitute error warranting remand.  The ALJ explicitly considered Dr. Lorensen's examination in her written decision, beginning with an examination of the "supportability" and "consistency" factors pursuant to 20 C.F.R. § 416.920c(b)(2). (T. 19).  First, the ALJ found that Dr. Lorensen's detailed narrative report adequately supported her opinions as to plaintiff's functional limitations.  (*Id.*).  *See* 20 C.F.R. §§ 416.920c(c)(1)(Supportability). The ALJ then stated that the limitations opined by Dr. Lorensen were consistent with plaintiff's history of orthopedic treatment for on-going pain associated with degenerative disc disease.  (*Id.*).  *See* 20 C.F.R. §§ 416.920c(c)(2)(Consistency).  Last, the ALJ considered that Dr. Lorensen was an acceptable medical source who had an opportunity to examine the claimant (*see* 20 C.F.R. §§ 416.920c(c)(3) (Relationship with the claimant)), as well as the consultative examiner's understanding of disability program policies and evidentiary requirements (*see* 20 C.F.R. §§ 416.920c(c)(5) (Other factors)).

The ALJ went on to qualify her evaluation of Dr. Lorensen's opinion as it related to plaintiff's ability to turn his head.  Recognizing the evidence that plaintiff displayed reduced cervical range of motion, the ALJ countered that there was no medical evidence in the record demonstrating that the plaintiff was *unable* to turn his head from side to side, or look up and down.  (*Id.*).  The ALJ cited to plaintiff's admitted ability to drive a car, suggesting that he could sufficiently turn his head to perform basic driving tasks.  (*Id.*).

Plaintiff attempts to characterize the ALJ's analysis of Dr. Lorensen's opinion as internally inconsistent – claiming the ALJ failed to actually adopt those opinions which

she purported to find "persuasive." This is simply not the case.  Here, the ALJ accepted most, if not all, of the limitations opined by Dr. Lorensen in finding that plaintiff retained an RFC to perform modified light work.  As defendant points out, courts in this district have consistently found that moderate exertional limitations are consistent with an ability to perform the full range of light work.  *See Thola J.W. v. Comm'r of Soc. Sec.*, No. 5:19-CV-1068 (GLS), 2021 WL 981589, at *2 (N.D.N.Y. Mar. 16, 2021) (finding RFC for a full range of light work was consistent with moderate limitations in lifting, carrying, pushing, and pulling); *Raymonda C. v. Comm'r of Soc. Sec.*, No. 3:19-CV-0178 (GTS), 2020 WL 42814, at *4 (N.D.N.Y. Jan. 3, 2020) ("[C]ourts have consistently found that a 'moderate' limitation in [standing, walking, lifting, and carrying] is essentially equivalent to an ability to perform light work." (collecting cases)); *Amanda L. v. Saul*, No. 8:18-CV-01221 (NAM), 2019 WL 5865388, at *8 n.3 (N.D.N.Y. Nov. 8, 2019) ("[M]oderate limitations to repetitive lifting, bending, reaching, pushing, pulling, or carrying are not inconsistent with an RFC for a full range of light work.") (internal quotation marks and citation omitted)).

Plaintiff makes much of the ALJ's conclusion that plaintiff retained the ability to turn his head and look up and down, despite Dr. Lorensen's opinion for moderate limitations.  However, this court is not convinced that the RFC is inapposite to Dr. Lorensen's opinion.  *See Donald P. v. Comm'r of Soc. Sec.*, No. 6:20-CV-00216 (NAM), 2020 WL 6253606, at *9 (N.D.N.Y. Oct. 23, 2020) (no error where plaintiff failed to support his claim that moderate limitations with regard to neck movement precluded him from performing light work); *Mahon v. Colvin,* No. 13 Civ. 8817, 2015

21

WL 5697861, at *13 (S.D.N.Y. Sept. 28, 2015) (consultative examiner's moderate restrictions for activities requiring turning of the neck did not support plaintiff's claim that he lacked the exertional capacity for light work).

Even if the ALJ had effectively rejected a portion of Dr. Lorensen's opinion in rendering an RFC allowing for head movement, she was under no obligation to accept the consultative examiner's opinion as a whole. *See Crumedy v. Comm'r of Soc. Sec.,* No. 16-CV-1261, 2017 WL 4480184, at *5 (N.D.N.Y. Oct. 6, 2017) ("[T]here is no requirement that the ALJ accept every limitation in an opinion where portions of that opinion are not supported by the evidence."); *Lianna M. D. v. Kijakazi*, No. 8:20-CV-0615 (LEK), 2021 WL 4150102, at *7 (N.D.N.Y. Sept. 13, 2021)(citing *Gough v. Saul*, 799 F. App'x 12 (2d Cir. 2020)) ("It is within the province of the ALJ to resolve conflicts in the medical evidence so long as the ALJ explains how the evidence conflicts and how they resolve the conflict."). Here, the ALJ explicitly discussed her evaluation of and ultimate conclusion as to plaintiff's retained ability to move his head, justifying her evaluation with evidence garnered from the record.

Plaintiff's suggestion that the ALJ impermissibly relied on her own lay judgment in developing the RFC determination is equally unfounded. The ALJ concluded that plaintiff was "capable of turning his head from side-to-side and looking up and down" as would be required in a job categorized as light work. (T. 15). As previously discussed, it was not unreasonable for the ALJ to draw this conclusion based on (1) the moderate limitations opined by Dr. Lorensen, and (2) evidence of plaintiff's activities of daily living. Otherwise, the ALJ reasonably accounted for all the other limitations

opined by Dr. Lorensen, and there is no evidence that the ALJ assessed plaintiff's RFC based on her own interpretation of raw medical data. Accordingly, remand is not warranted on this basis.

### 2. PA Bossi

The record also contains a January 30, 2019 Medical Source Statement ("MSS") from PA Rachel Bossi. (T. 705-07). PA Bossi indicated that she had treated plaintiff, presumably for pain management, on three separate occasions prior to rendering her medical opinion. (T. 705). The medical records reflecting PA Bossi's treatment of plaintiff were not included in the record before the ALJ, nor are they presently before this court.

PA Bossi left many sections of her medical source statement unanswered, indicating that they were "not applicable." She did note that plaintiff's diagnoses included central canal stenosis, foraminal stenosis, and degenerative disc disease, with a lifelong and guarded prognosis. (*Id.*). She also opined that plaintiff required a job allowing him to shift positions, and would sometimes need to take unscheduled breaks during an 8 hour work day. (T. 705). She further opined that plaintiff could occasionally lift and carry up to 10 pounds, rarely lift 20 pounds, and never lift 50 pounds. (T. 706). PA Bossi concluded that plaintiff could occasionally use his hands to grasp, turn, and twist objects, as well as occasionally use his fingers for fine manipulation. (*Id.*). She concluded that plaintiff could never reach with his arms. (*Id.*). PA Bossi opined that plaintiff's pain would frequently interfere with his attention and concentration, and that he would be absent more than four days per month due to

his impairments and treatment.  (T. 706-07).

The ALJ evaluated PA Bossi's opinion and concluded that it was "not persuasive."  (T. 19).  The ALJ pointed out that PA Bossi had not provided specific clinical findings to support her opinion.  (*Id.*).  She also cited various examples of how the opinion was inconsistent with other evidence of record.  (*Id.*).  Last, the ALJ considered PA Bossi's limited relationship to the plaintiff.  (*Id.*).

Plaintiff argues that the ALJ improperly rejected PA Bossi's opinion for lack of supportability, because the ALJ did not seek out the three missing treatment notes by PA Bossi in order to fully develop the record.  Plaintiff appears to have conflated the new standards for evaluating medical evidence with the ALJ's duty to develop the record.

The supportability factor under 20 C.F.R. § 416.920c(c)(1) states that a medical opinion's persuasiveness is based, in part, on the objective medical evidence and supporting explanations provided by a medical source with his or her ultimate conclusions.  In this case, the ALJ properly found that within her own MSS, PA Bossi did not cite to any evidence, or provide any commentary, supporting her opined limitations.  The MSS is rendered in the form of a check-box questionnaire, and the only commentary provided is PA Bossi's admission that she had not treated plaintiff's lower back and right ankle injuries.  (T. 705).  The applicable regulations clearly permitted the ALJ to detract persuasiveness from PA Bossi's opinion based on her failure to support her restrictive findings with any supporting evidence.  PA Bossi's failure to support her own opinion was, as determined by the ALJ, exacerbated by the

fact that her restrictive limitations were inconsistent with plaintiff's history of benign physical and neurological examinations by various medical sources during the relevant disability period.  (T. 19).

Plaintiff's contention that the ALJ failed to develop the record as to PA Bossi's treatment notes, while a separate issue, and also meritless.  At the administrative hearing, the ALJ explicitly asked plaintiff's counsel whether the record was complete as to medical evidence.  (T. 42-43).  Counsel responded in the affirmative, and neither plaintiff nor counsel stated that additional medical records needed to be obtained.[4] Moreover, despite his present contentions it is apparent that plaintiff did not provide the missing records to the Appeals Council after the administrative hearing, has not provided them to this court upon judicial review, and has failed to even describe what objective evidence these records possess.  Under the circumstances, this court is hard pressed to find that the ALJ was derelict in her duty to develop the record.  *See Curley v. Comm'r of Soc. Sec. Admin.,* 808 F. App'x 41, 44 (2d Cir. 2020) (finding no failure to develop the record where the attorney did not state at the hearing that any records were missing, and he did not "provide them to the district court [or] describe their contents"); *Streeter v. Comm'r of Soc. Sec.*, No. 5:07-CV-858 (FJS), 2011 WL 1576959, at *4 (N.D.N.Y. Apr. 26, 2011) (holding an ALJ had satisfied her duty to develop the record when "the ALJ specifically asked Plaintiff's counsel, during the hearing, if the medical records were complete, to which Plaintiff's counsel responded

---

[4]This is somewhat suspicious, considering that counsel had submitted PA Bossi's opinion to the Commissioner only one week prior to the administrative hearing.

affirmatively").

In any event, the ALJ did not reject PA Bossi's opinion based on what might have been contained in the three[5] missing treatment notes.  Instead, the ALJ relied on the opinion's lack of supportability, and lack of consistency with the *other* evidence of record, in concluding that the opinion was not persuasive.  *See Gentile v. Saul,* No. 3:19-CV-01479, 2020 WL 5757656, at *7 (D. Conn. Sept. 28, 2020) (distinguishing similar circumstances from cases where ALJ specifically used gap in the record to discount an opinion).  The ALJ also considered that PA Bossi had only treated plaintiff on three occasions.[6]  Thus, even if PA Bossi's treatment records had been before the ALJ, there is nothing to suggest that this would have altered the ALJ's evaluation of the medical opinion or ultimate disability determination.  *See Santiago v. Astrue*, No. 3:10-CV-00937, 2011 WL 4460206, at *2 (D. Conn. Sept. 27, 2011) ("When an unsuccessful claimant files a civil action on the ground of inadequate development of the record, the issue is whether the missing evidence is significant. The plaintiff in the civil action

---

[5]According to PA Bossi's MSS, plaintiff presented on "11/14" for an "initial visit," "12/12" for a "follow-up," and "1/14" for an "injection.  (T. 705).  She prepared the opinion on January 30, 2019.  (T. 707).

[6]The ALJ did err in one respect, when she cited to outdated regulations in concluding that "Ms. Bossi is not an acceptable medical source[.]" (T. 19).  Under the new regulations, licensed physician assistants are considered acceptable medical sources for impairments within his or her licensed scope of practice.  *See* 20 C.F.R. §§ 404.1502(a)(8), 416.902(a)(8).  Moreover, the issue of whether PA Bossi was an *acceptable* medical source was not particularly relevant to the ALJ's evaluation of the MSS, as the new regulations require an ALJ to consider all medical opinions and evaluate their persuasiveness based on the five factors contained in 20 C.F.R. §§ 404.1520c(a)-(c) and 416.920c(a)-(c)).  Nevertheless, the ALJ's improper characterization of PA Bossi is not error meriting remand.  It was incumbent on the ALJ to evaluate all of the medical opinions of record, and she did; citing multiple bases for her conclusion that PA Bossi's opinion lacked persuasion.  Thus, even if the ALJ had recognized that PA Bossi was an acceptable medical source, it would not have changed the outcome of her decision.

must show that he was harmed by the alleged inadequacy of the record[.]") (internal citation omitted).  Accordingly, any error in failing to obtain PA Bossi's treatment notes was harmless, and remand is not warranted on this basis.

WHEREFORE, based on the findings above, it is

ORDERED, that the Commissioner's decision is **AFFIRMED**, and plaintiff's complaint is **DISMISSED**, and it is

ORDERED, that judgment be entered for the **DEFENDANT.**


Dated:  October 18, 2021

Andrew T. Baxter
U.S. Magistrate Judge

27